[No. AO18305. First Dist., Div. Two. Oct. 20, 1983.]

GEORGE E. VALENTINE, Plaintiff and Respondent, v.
CITY OF OAKLAND et al., Defendants and Appellants.

140

COUNSEL

Richard E. Winnie, City Attorney, and Robert T. Anderson for Defendants and Appellants.

A. Charles Dell'Ario for Plaintiff and Respondent.

## OPINION

**SMITH, J.**—The City of Oakland and various officials for the City of Oakland and for the County of Alameda (collectively City) are respondents below in a taxpayer action for declaratory relief brought under Revenue and Taxation Code section 4808[1] by petitioner George Valentine on behalf of himself and other taxpayers similarly situated. City appeals from a judgment declaring that a property tax override levied by resolution of the Oakland City Council (Council) designated "1981 Pension Liability Fund" is void and unconstitutional as contravening article XIII A of the California Constitution, and also from a subsequent order awarding Valentine attorney fees.

The issue presented here is whether the tax levy falls within the tax limitation exemption provided in section 1, subdivision (b), of that article for "taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters" prior to the effective date of the section. We hold that the tax levy was authorized and hence constitutional under the above mentioned section and subdivision to the extent that such levy applied to fund two of the three pension systems designated to receive the revenues generated by the resolution.

### I.

In a special municipal election held on December 21, 1926, Oakland voters approved an amendment to the city charter by which the Oakland Municipal Employees Retirement System (OMERS) was established for aged and disabled city employees. On November 5, 1968, the voters adopted a new city charter, section 809 of which authorized the City to "continue as a contracting agency" in any existing retirement or pension systems.[2]

---

[1]Section 4808 of the Revenue and Taxation Code provides in pertinent part as follows: "Notwithstanding any provision of law to the contrary, any taxpayer may, no later than 30 days after the delinquency date of a property tax bill or any installment thereof, seek declaratory relief in the superior court in the county in which the property is located alleging that the locally assessed property taxes have been illegally or unconstitutionally assessed or collected or are to be so assessed or collected.

". . . The relief granted pursuant to this section shall be limited to a declaration that the taxes assessed or collected or to be assessed or collected are unconstitutional or otherwise legally invalid.

". . . . . . . . . . . . . . . . . . . . . . .

"The procedure for obtaining a declaratory relief judgment under this section shall be the same as that used to obtain a writ of mandate."

[2]Section 809 of the charter, titled "Authority to Join Pension System," provides in pertinent part as follows: "[T]he City, by and through its Council, may join, or arrange for reciprocity of membership in, or continue as a contracting agency in, any retirement or pension system or systems existing or hereafter created under state or federal law to or in which municipalities and municipal officers or employees are eligible, either for all such officers and employees, or for less than all on the basis of a reasonable classification, provided that no employee or officer or classification thereof shall be unreasonably omitted from all systems referred to in this section . . . of this Charter."

In 1951, two preexisting pension funds were combined to form the Police and Fire Retirement System (PAFRS). With adoption of the new city charter on November 5, 1968, PAFRS became part of article XXVI of that charter.

On September 1, 1970, City, through the action of the Council, passed Ordinance No. 8202 CMS, which authorized and approved a contract between the City and the Board of Administration of the Public Employees' Retirement System (PERS). Action on the contract was delayed by a preliminary injunction issued in the case of Van Fleet et al. v. City of Oakland et al., Alameda Superior Court Action No. 403056, until after judgment in the case on June 1, 1972, quashing the preliminary injunction and upholding the contract as authorized by section 809 of the charter (see fn. 2, *ante*). The Council thereafter amended the contract several times by resolution and ordinance. Then, on May 11, 1976, the Council passed a resolution of intention to approve a contract amendment which, among other things, removed the contract's prior exclusion of local fire and police employees as to such of those employees hired for the first time on or after July 1, 1976.

On June 8, 1976, city voters approved "Measure R," a charter amendment affecting sections of article XXVI of the charter dealing with PAFRS. Among other things, the measure amended the definition of "members" under the system to exclude those fire and police employees hired on or after July 1, 1976.[3] Various newspaper articles appeared prior to the election, describing the effect of the measure as forcing uniformed police and fire personnel hired in the future into the state retirement system.

In the statewide primary election of June 1978, the voters adopted Proposition 13, a property tax reform initiative, which added article XIII A to the California Constitution. Section 1 of the article provides, in part: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. . . . [¶] (b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption

---

[3]Measure R, as it appeared in summary form on the ballot, read:

"MEASURE R: Amends Sections 2602, 2607, 2608, 2610, 2618 and 2619 of the Oakland City Charter relating to the Police and Fire Retirement System:

"(a) by limiting membership in the System to police officers and fire fighters employed before July 1, 1976; by eliminating additional City contributions required by a 4% limit on assumed investment earnings of the System; by providing a maximum of one year from date of disabling injury to date of service-connected disability retirement; by setting a maximum of 13% of salary on member's contributions; by increasing members' benefits to provide for vesting after ten years, for nonservice-connected disability retirement after five years of service, for limited bonuses for years of service, and for retirement after twenty years of service regardless of age; by requiring actuarial valuation at least once every three years instead of every five years; by making certain technical changes; and

"(b) by allowing unfunded City contributions to be amortized over a 40-year period."

charges on any indebtedness approved by the voters prior to the time this section becomes effective." Section 1 became effective on July 1, 1978. (Cal. Const., art. XIIIA, § 5.)

On August 4, 1981, the Council passed Resolution No. 59916 CMS, which in part fixed and levied a tax of 0.1566 percent on taxable real and personal property within the City. Of that amount, the figure 0.1530 percent was designated in the resolution for a "1981 Pension Liability Fund."[4] By another resolution, passed on March 2, 1982 (after the instant action was filed), the Council created a fund so denominated. City's 1981-1982 Budget Summary showed an expected $8.3 million from the 0.1530 percent override.

Valentine filed a petition for declaratory relief (Rev. & Tax. Code, § 4808) on January 8, 1982, challenging the constitutionality of Resolution No. 59916 CMS insofar as it levied a tax override of 0.1530 percent for the "1981 Pension Liability Fund" (hereinafter sometimes pension fund). An alternative writ of mandate issued on February 25th. On April 9, 1982, following a hearing, the trial court entered its order and judgment, declaring the 0.1530 percent pension fund tax override levied by the resolution void and unconstitutional as contravening article XIII A of the state Constitution. On May 13, 1982, upon motion of Valentine brought under Code of Civil Procedure section 1021.5, the court awarded Valentine attorney fees of $9,000.

On May 10, 1982, our Supreme Court filed its opinion in *Carman* v. *Alvord* (1982) 31 Cal.3d 318 [182 Cal.Rptr. 506, 644 P.2d 192]. Thereafter, on May 13th, City noticed motions to set aside the order and judgment of April 9, 1982, and to vacate or set aside the May 13th order allowing attorney fees, based on the *Carman* decision. By an order filed on May 27, 1982, the trial court denied both motions on grounds that the court lacked jurisdiction to set aside the April 9th judgment, since it was not a void judgment (Code Civ. Proc., § 473), and that the attorney fee award premised on that judgment was therefore not incorrect or erroneous (Code Civ. Proc., § 663, subd. 1).

---

[4]The full resolution, as it pertains to the 0.1566 percent tax, reads:

"RESOLVED: That a tax of 0.1566% is hereby fixed and levied for the Fiscal Year 1981-82 on taxable property, real and personal, within the corporate limits of the City of Oakland, and the tax so levied and the money arising therefrom, when collected, shall be and is hereby set apart and apportioned between the following funds requiring municipal expenditures for the Fiscal Year 1981-1982:

"1959 Municipal Improvement Bond
 Interest and Redemption Fund...............................................0.0011%
"1961 Public Museum Bond Interest
 and Redemption Fund.......................................................0.0025%
"1981 Pension Liability Fund........................................................0.1530%"

Timely appeal was taken by City on June 8, 1982, from the April 9th judgment and from the May 13th order awarding attorney fees.[5] We granted the City's motion to advance the case on calendar.[6]

## II.

The central question posed is whether the pension fund tax override is authorized, and hence valid, under section 1, subdivision (b) of article XIII A of the California Constitution.[7] City takes the position that (1) the decision in *Carman* v. *Alvord, supra,* 31 Cal.3d 318, is dispositive of the tax's validity, and (2) if not, then application of the section 1, subdivision (a) tax limitation to invalidate the override would constitute an impairment of the obligation of contract in violation of the federal Constitution. Respondent counters that the *Carman* decision does not require validation of the override and that the contract clause of the federal Constitution would not be offended by invalidation of the tax. Respondent further urges that the tax, while designated for the "1981 Pension Liability Fund," is in reality "nothing more than a subterfuge for a general unrestricted levy," and he asks for additional attorney fees on appeal.

*The City's Pension Obligations Are "Indebtedness" Under the Constitution*

We first examine article XIII A. Subdivision (b) of section 1 provides that the 1-percent-of-full-cash-value limitation (subd. (a)) "shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to [July 1, 1978]." Thus the ad valorem tax levied by the City was authorized if the revenue it generates will go to pay (1) the "interest and redemption charges" on (2) "any indebtedness approved by the voters" prior to July

---

[5]The order awarding attorney fees is appealable as an order after judgment. (Code Civ. Proc., § 904.1, subd. (b); *Raff* v. *Raff* (1964) 61 Cal.2d 514, 519 [39 Cal.Rptr. 366, 393 P.2d 678]; see *Commercial & Farmers Nat. Bank* v. *Edwards* (1979) 91 Cal.App.3d 699, 702 [393 P.2d 678]; *Breckler* v. *Thaler* (1978) 87 Cal.App.3d 189, 193 [151 Cal.Rptr. 50].)

[6]Revenue and Taxation Code section 4808, by which this action was brought, was added by section 1 of Statutes 1981, chapter 550, pages 2201-2202. Section 3 of that statute states: "It is the intent of the Legislature that actions pursuant to Section 4808 of the Revenue and Taxation Code be quickly heard and determined in both the trial court and the appellate courts in order that final tax liabilities may be determined at the earliest possible moment." Moreover, section 2 of that statute amended Revenue and Taxation Code section 5146 to read: "All courts wherein actions brought under this part [Part 9, which includes § 4808] are or hereafter may be pending shall give such actions precedence over all other civil actions therein, except actions to which special precedence is given by law, in the matter of setting same for hearing or trial, and in hearing same, to the end that all such actions shall be quickly heard and determined." (Stats. 1981, ch. 550, § 2, p. 2202.) The motion to advance was granted in accordance with that legislative intent.

[7]For ease of discussion, all section and subdivision references hereinafter are to article XIII A of the state Constitution unless otherwise indicated.

1, 1978. We are compelled by the Supreme Court's construction of that language in *Carman*.

The court in *Carman* held that an ad valorem tax levied by the City of San Gabriel in order to meet the city's obligations to PERS came within the voter-approved prior indebtedness exemption of article XIII A. The local electors had in 1948 (long before Prop. 13) approved a ballot measure authorizing the city to join the State Employees' Retirement System (now PERS) and also to "levy and collect annually . . . a special tax sufficient to raise the amount estimated by [the city council] to be required to provide sufficient revenues to meet the obligations of [the city]" to PERS. (31 Cal.3d 318, 322 & fn. 2.) Exercising that authority, the city contracted with PERS and collected annual taxes to fund its contributions. At issue in *Carman* was a tax levied for 1978-1979 (after the effective date of Prop. 13) to defray the city's PERS obligations. (Pp. 322-323.)

Rejecting arguments that the term "any indebtedness" as used in the tax limit exemption (§ 1, subd. (b)) was limited to bonded or secured indebtedness, and that the phrase "interest and redemption charges" did not include pension fund obligations, the court in *Carman* held that "indebtedness as traditionally understood covers obligations arising under City's pension plan" (pp. 326-327) and concluded that " 'interest and redemption charges' denotes no more or less than the sums from time to time necessary to avoid default on obligations to pay money, including those for pensions." (P. 328, fn. omitted.)

In the instant case, City's three pension systems and the nature of its obligations to those systems appear not to differ in any material respect from the pension and obligations considered in *Carman*. Valentine makes no attempt to distinguish that aspect of *Carman* and thus apparently concedes the point. ■ We therefore conclude that, for purposes of the subdivision (b) exemption, the City's obligations arising under OMERS, PAFRS and PERS constitute "indebtedness" and that sums paid by the City to avoid defaulting on those obligations constitute the payment of "interest and redemption charges."

*One of the Pension Systems—PERS—Was Never "Approved by the Voters"*

■ The next issue is voter approval. The exemption applies only to taxes levied to pay obligations on indebtedness "approved by the voters" prior to July 1978. There is no dispute as to two of the systems. Both OMERS and PAFRS were at some point submitted to the electorate for approval— OMERS in a 1926 special municipal election charter amendment, and PAFRS by adoption of the new city charter in 1968. (See fn. 2, *ante*.)

Although the record does not contain either the 1926 OMERS charter amendment or evidence of any voter approval of PAFRS prior to its authorized *continuation* in the 1968 charter, Valentine does not challenge the approval of those systems. He does, however, argue that PERS was never voter-approved. The City responds that PERS was "inferentially approved" by the voters' adoption of the 1976 charter amendment, Measure R.

As far as the record and arguments of counsel reveal, the PERS system was never directly submitted to City voters. From the initial approval and authorization of the contract in 1970 to the effective date of Proposition 13, all action on PERS was taken by the Council, acting without voter approval, pursuant to its authority under section 809 of the charter to join retirement or pension systems. (See fn. 2, *ante.*) City does not argue that the general authority granted by section 809 is enough to render PERS voter-approved.[8] Rather, it maintains that voter approval of Measure R in 1976 (before Prop. 13), amending the charter to exclude future uniformed fire and police hirees from PAFRS, was inferentially an approval of PERS because the consequence of excluding such hirees from PAFRS was to channel them into PERS. The Council preordained that consequence when, prior to and in anticipation of Measure R passing, the Council (without voter approval) amended the City's PERS contract to lift its prior exclusion of uniformed police and fire personnel from the system. Nothing in the election materials presented to the voters—the full text of Measure R, the ballot summary (fn. 3, *ante*), printed arguments for and against, or analyses by the city attorney and city auditor—directly indicates that future hirees would enter PERS or any other system.

We conclude that the City has failed to demonstrate prior voter approval of PERS. The voters never had the opportunity to accept or reject the system. It was never directly submitted for voter approval, and the implication of approval from Measure R's passage is too attenuated. To say that the voters, in passing Measure R, knew that they were effectively shifting future hirees from PAFRS into some other system begs the question. Into what other system would they go? The voters had never approved PERS and many may not even have known of it. The City argues that contemporary accounts in newspaper articles informed voters of the inevitable PAFRS-to-PERS shift. But that argument depends on speculative assumptions we are unwilling to make regarding voter reading habits; moreover, the newspaper accounts relied on by the City only briefly, and for the most part obliquely,

---

[8]Unlike PAFRS, PERS was not a system already in force in 1968 when the voters adopted the charter. Thus, no specific approval of PERS can be inferred from adoption of the charter.

mention the PAFRS-PERS impact.[9] Also, the packaging of Measure R, if anything, underplayed the measure's impact on other retirement systems. The measure was described as a tax saving reform in printed arguments, the city attorney's legal analysis, the city auditor's financial analysis, and in the newspaper articles. Savings to PAFRS was emphasized without explanation that some of that savings would be offset by increased obligations under another system. It would be unfair under these circumstances to infer voter approval of PERS from a "yes" vote on Measure R.

Since we hold that there was not the required voter approval of PERS, there remains a question expressly left open in *Carman*. The Supreme Court, in that case, declined to "decide how pension taxes authorized only by the governing body of a local agency might be treated." (31 Cal.3d 318, 333.) However, the court in *Carman* did observe: "Subdivision (b)'s focus on voter approval implies a concern that irrevocable, long-term obligations, *solemnly approved by local electorates* and entered on faith in taxing powers then available, not be frustrated by a revolutionary tax limitation imposed from outside the community. [Citation.]" (*Id.,* at pp. 327-328; italics added.)

Whatever imprecision and ambiguity may exist elsewhere in the language of article XIII A (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281]), the language of section 1, subdivision (b) requiring voter approval is clear and in no need of construction. The Constitution requires voter approval for any exception to the maximum amount of any ad valorem tax on real property. Therefore, we hold that the City's obligations under PERS do not constitute indebtedness "approved by the voters" for purposes of subdivision (b) exemption.

*The Subdivision (b) Exemption Does Not Require Voter Approval of the Specific Tax Levy; Voter Approval of the "Indebtedness" Is Sufficient*

 Respondent urges that it is necessary for purposes of the subdivision (b) exemption that the voters previously approve not only the "indebtedness" but also the specific tax levied to fund that indebtedness from year to year. There is no question but that the voters did not approve the specific override levied here.

A reading of the exemption language lends no support to Valentine's position. "The limitation provided for in subdivision (a) shall not apply to

---

[9]Of the five newspaper articles contained in the record, four make one-sentence mention of future uniformed police and fire employees being placed into the "state retirement system" or "state system" and only the fifth one, of equally brief mention, specifically identifies PERS as that system.

ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters . . . ." (§ 1, subd. (b).) The meaning is clear: Once the indebtedness is found to have had the voters' prior approval, ad valorem taxes etc. to pay the obligations arising thereunder are exempt, and there is no express requirement that such taxes need also be voter approved.

However, Valentine finds support for his argument that both the indebtedness and the tax need prior voter approval, not in the language of the Constitution, but in words of amplification by our Supreme Court in *Carman*. He also relies on the fact that in cases cited by the court in *Carman*, the voters of the local agency had obtained the approval of the voters as to the specific tax levy in question prior to the effective date of Proposition 13.

In *Carman*, the voters had approved a ballot proposition prior to July 1978 empowering the city not only to participate in the retirement system (PERS) but also to *levy and collect annually* a special tax sufficient to meet the city's obligations to the system. (31 Cal.3d 318, 322 & fn. 2.) Valentine cites to several places in the *Carman* opinion where the court's language suggests that a second voter approval—of the specific tax levy—is required. In particular, he relies on the following conclusions reached by the court on page 333: "We conclude that subdivision (b) exempts from the article XIII A tax limitation the *voter-approved tax* to fund City's pension commitments. [¶] . . . Here we conclude . . . that section 1, subdivision (b) of article XIII A exempts from the tax limit those pensions *and corresponding tax levies approved by the voters* before the limitation became effective. [Fn. omitted.]" (Italics ours.)

We reject the notion that the Supreme Court, by the above quoted language, was engrafting upon the exemption a second voter approval requirement. The issue of whether a second approval is necessary was not before the court. Thus, for example, where the opinion states, "Here, we conclude *only* that [subdivision (b)] exempts from the tax those pensions and corresponding tax levies approved by the voters . . ." (31 Cal.3d 318, 333; italics added), the court appears to be simply tailoring its holding to the particular facts before it. ■ "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered. [Citation.]" (*Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

For the same reason, we are persuaded that cases relied on in *Carman* are of little value on the question of second voter approval. In *County of*

*Shasta* v. *County of Trinity* (1980) 106 Cal.App.3d 30 [165 Cal.Rptr. 18], voters approved a proposal to create a joint community college district *and,* while not assuming the prior district's bonded indebtedness, to pay an annual use charge for its property "in an amount equal to the amount necessary for the interest and redemption of the old district's bonds." (*Id.,* at pp. 35, 38.) In *Kern County Water Agency* v. *Board of Supervisors* (1979) 96 Cal.App.3d 874 [158 Cal.Rptr. 430], county voters approved a contract between the Department of Water Resources and the Kern County Water Agency (Agency) *plus* an ad valorem property tax levy for any year in which the Agency could not raise sufficient funds by other means to pay its obligations as they came due. (*Id.,* at pp. 877-878.) Therefore, neither *County of Shasta* nor *Kern County Water* posed the question of whether a second voter approval is required, and hence neither case is instructive on the issue. A post-*Carman* case to have considered the issue of prior voter approval, *City of Watsonville* v. *Merrill* (1982) 137 Cal.App.3d 185 [136 Cal.Rptr. 857], is similarly not helpful because there the voters approved, by charter amendment, a retirement system (PERS) *along with* a provision enabling the city to levy and collect additional taxes as needed to meet all liabilities due or to become due in the ensuing fiscal year. (*Id.,* at pp. 189-190.)

While the particular holding in *Carman* regarding prior voter approval is, as we have explained, not directly helpful because of the distinguishable facts presented therein, the court's observation regarding subdivision (b)'s implied "concern that irrevocable, long-term obligations, solemnly approved by local electorates and entered on faith in taxing powers then available, not be frustrated by a revolutionary tax limitation from outside the community" (31 Cal.3d 318, 327-328) supports the view of the City—that second voter approval is not required unless, of course, the local agency otherwise lacks authority to levy the specific tax from year to year. That view is also consistent with the plain language of the exemption.

It is undisputed that appellant City, as a charter city exercising powers conferred by the home rule provision of the California Constitution (art. XI, § 5, subd. (a); see *Weekes* v. *City of Oakland* (1978) 21 Cal.3d 386, 390 [146 Cal.Rptr. 558, 579 P.2d 449]), had authority to levy the tax override here at issue, provided its actions were constitutional under article XIII A. (See *Weekes* v. *City of Oakland, supra,* at p. 400 (conc. opn. of Richardson, J.); *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 135 [98 Cal.Rptr. 281, 490 P.2d 793]; *Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 345-346 [71 Cal.Rptr. 135, 444 P.2d 711].)[10] ▮ We therefore

---

[10]With respect to the distinction between charter cities and general law cities in this regard, we note the recent enactment of Government Code section 37100.5, which provides: "The legislative body of any city may levy any tax which may be levied by any charter city,

hold the City was not required by section 1, subdivision (b), of article XIII A to obtain prior voter approval for the tax levy insofar as the levy was apportioned to pay the City's obligations under PAFRS and OMERS, both of which systems constitute voter-approved prior indebtedness.

*Application of the Subdivision (a) Tax Limitation in This Case Would Not Result in a Demonstrated Unconstitutional Impairment of the Obligation of Contract*

■ If the tax levy as it pertains to PERS is invalid as not exempt from the 1-percent-of-full-cash-value limitation of article XIII A, would such a declaration of invalidity unconstitutionally impair the City's obligation under the PERS contract? (U.S. Const., art. I, § 10, cl. 1.)

Our Supreme Court has twice noted this potential constitutional problem of which the City complains and has declined both times to reach the question. In *Carman,* the city, as here, argued "that article XIII A, if construed to repeal City's special pension tax, might so impair pension rights as to violate the federal contract clause," and the court observed that "[s]ubstantial issues of that nature" were present, reasoning as follows: "Cases have held that when a municipality was authorized to contract and to levy a corresponding tax, the tax power could not be revoked until the contract was fulfilled. [Citations.] This court has said that '[t]he pension provisions of a city charter or ordinance form an integral part of the employment contract.' Where feasible they should be construed as providing adequate funds to meet employees' reasonable expectations. [Citation.]" (31 Cal.3d 318, 332, quoting from *Bellus* v. *City of Eureka, supra,* 69 Cal.2d 336, 351.) Resolution of the case in the city's favor, however, rendered the question unnecessary to decide in *Carman.* In *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, the court had earlier considered the potential contract clause problem inherent in article XIII A but ultimately found the issue to be prematurely raised and raised by a party with doubtful standing. (*Id.,* at pp. 238-242.)

We find the following comment of the court in *Amador* equally applicable here. "[A]rticle XIII A on its face neither directly repudiates any express covenant with municipal obligees nor immediately impairs any contract right. . . . [T]he federal contract clause (art. I, § 10) applies only to a 'substantial impairment of a contractual relationship.' [Citation.] In the absence of a factual record disclosing any *present, specific and substantial impair-*

---

subject to the voters' approval pursuant to Article XIII A of the Constitution of California." (Stats. 1982, ch. 327, § 88, p. 1458.)

*ment* of contract attributable to the adoption of article XIII A, we must reject petitioners' impairment of contract challenge because it is premature." (Italics added.) (*Amador, supra,* 22 Cal.3d 208, 241, quoting from *Allied Structural Steel Co.* v. *Spannaus* (1978) 438 U.S. 234, 244 [57 L.Ed.2d 727, 736, 98 S.Ct. 2716]; see also *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.* (1983) 459 U.S. 400, 411-412 [74 L.Ed.2d 569, 580-581, 103 S.Ct. 697, 704-705]; *Allen* v. *Board of Administration* (1983) 34 Cal.3d 114, 119 [192 Cal.Rptr. 762, 665 P.2d 534].) Although *Amador* was decided just shortly after the effective date of article XIII A, when the article's effects could not be definitely determined, we face a similar problem here because, upon this record, we are unable to perceive any "present, specific and substantial impairment" of the City's obligations under PERS resulting from partial invalidation of the tax levy.

The City points out that Oakland, along with other local governments throughout the state, is feeling the pressure of the constitutional tax limitation, "bail-out" funds are no longer available, extensive cutbacks in services have been made and additional sources of revenue are gradually being exhausted. However, nothing in the record or briefs suggests an impending inability to meet PERS obligations without resort to property tax overrides.

First, the record is silent as to how much of the $8.3 million expected from the override was destined for PERS funding. For all that appears, perhaps none of it was specifically earmarked for that system. Indeed, the City describes the levy in its opening brief as "an additional property tax which would raise the approximate sum of $8,300,000 to pay a portion of the City's required contribution to PAFRS." That characterization may, however, merely reflect the City's paramount concern for PAFRS, its greatest liability at present in light of its commitment through the Measure R charter amendment to fully fund that system—a $400 million commitment—by the year 2016. (See fn. 3, *ante.*)

That raises the second point of uncertainty here should the tax limitation be allowed to invalidate PERS funding through the override. The City relies in large part upon the declaration of its retirement systems manager, which declaration limits analysis to uniformed police and fire personnel in PERS, even though the record discloses that nonuniformed personnel also come within PERS. City contributions for such uniformed personnel, according to the declaration, total $25,761,417 for fiscal year 1981-1982, of which only $1,179,471 is required for PERS. It is apparent that the total $8.3 million at stake in the override—of which an undisclosed portion is destined for PERS—is roughly only one-third of the City's total obligation, and that total is for uniformed personnel alone.

Third and finally, the record does not show dependence on a property tax override to meet PERS funding obligations prior to the 1981-1982 attempted levy. In its opening brief, the City states that "it was not until the 1981-82 fiscal year that the Council concluded . . . that the additional property tax for retirement fund purposes should be levied rather than further substantial cuts in service being made."

Upon this record, the City's contract clause claim must fail for lack of a demonstrable impairment. (See *Kern County Water Agency* v. *Board of Supervisors, supra,* 96 Cal.App.3d 874, 880 [contract clause claim based on article XIII A rejected where record did not establish that obligation could not be met without the use of ad valorem taxes or assessments].)

*The Motives of the Council in Levying the Override Were Presumptively Proper*

As a further contention, Valentine suggests that the City's resolution levying the override for a "1981 Pension Liability Fund" is in fact an unrestricted general tax levy designed to overcome the then recent defeat of Measure A, submitted to the electors on April 21, 1981, as the "Oakland Anti-Crime Act of 1981." The measure, proposed as a "special tax" under section 4 of article XIII A, failed to get the requisite two-thirds vote of the electors.[11] If passed, it would have generated anticipated net revenues of $37,240,000 over a four-year period ending in June 1985 with which to increase the number of Oakland Police Department personnel, maintain the existing level of police services and administer the program.

An analogous contention was raised and rejected in *National Independent Business Alliance* v. *City of Beverly Hills* (1982) 128 Cal.App.3d 13 [180 Cal.Rptr. 59]. There, on the eve of Proposition 13's effective date, the city council passed an urgency ordinance to become effective that same day, and the appellant therein argued that the ordinance should not take effect until 30 days after its adoption because it was not truly an urgency ordinance but rather an avowed attempt to avoid recourse to the two-thirds vote requirement of article XIII A for special taxes. (See fn. 11, *ante.*) The appellate court stated: "[E]ven if that had been the council's secret intent rather than its express intent, it would be irrelevant if the council had the power to enact at the time that it did. 'The motives of a city's legislative body in passing an ordinance will not ordinarily be considered in determining its validity, in the absence of a showing of fraud, at least where nothing on the

---

[11]Article XIII A, section 4 provides: "Cities, counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

face of the ordinance shows that it was passed for improper motives, or where its passage for improper motives is not inferable from its operation or effect under circumstances of which judicial notice may be taken. There is a presumption that the legislative body acted from proper motives.' (45 Cal.Jur.3d, Municipalities, § 202, pp. 320-321.)" (*Id.,* at p. 22.) The court in *National Independent* concluded that it could not properly take judicial notice of what "unusual and current" expenses might justify the urgency of the ordinance. (*Ibid.*)

■ In the instant case, we have concluded that the City had authority to levy the tax override for OMERS and PAFRS by resolution of its Council. Certainly nothing on the face of the resolution shows an improper motive, and no such motive appears inferentially through its operation or effect. The defeated Measure A did not purport to provide pension system funding as did the later resolution. Thus, there is no appearance of subterfuge in the adopting of the resolution. The presumptive propriety of the Council's motives has not been overcome.

We similarly find no improper purpose behind the City's decision to show the "1981 Pension Liability Fund" in the police department budget for fiscal year 1981-1982. Which accounting method is chosen for budgetary purposes seems of little relevance; certainly the City's obligations to PAFRS (for fire and police personnel) make the police department budget a logical choice. If respondent objects to what he anticipates will be an unauthorized use of pension fund tax revenues, his concern is premature, as is any remedy at this point.

Respondent asks that in the event the judgment is affirmed, we remand for consideration of an award of attorney fees on appeal for services rendered in securing a substantial constitutional benefit upon City taxpayers. (Code Civ. Proc., § 1021.5; *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 49-50 [141 Cal.Rptr. 315, 569 P.2d 1303].) As we will modify and affirm the judgment, remand for such consideration is appropriate. (See *Parrott* v. *Rogers* (1980) 103 Cal.App.3d 377, 383 [163 Cal.Rptr. 75].)

### III.

We conclude that the 0.1530 percent tax levied by the City through Resolution No. 59916 CMS is valid as exempt under section 1, subdivision (b), of article XIII A of the California Constitution from the property tax limitation of section 1, subdivision (a), to the extent that such tax will go to fund the City's 1981-1982 fiscal year obligations to OMERS and PAFRS, systems which were approved by the voters prior to the effective date of article XIII A. Because we further conclude that PERS was not voter-ap-

proved within the meaning of the subdivision (b) exemption, the tax levy is invalid insofar as it funds obligations arising under PERS.

Accordingly, the first sentence of paragraph three of the judgment of April 9, 1982, is modified in part to read as follows: ". . . City of Oakland Resolution No. 59916 CMS and the tax levied thereby in the amount of 0.1530% for the 1981 Pension Liability Fund are declared void and unconstitutional as in contravention of article XIII A of the California Constitution to the extent that they allow tax revenues generated thereby to be used to fund obligations of the City of Oakland to the Public Employees' Retirement System." As so modified, the judgment is affirmed, and the cause is remanded to the superior court to fix and award reasonable attorney fees, if any, to respondent Valentine for services rendered on this appeal (Code Civ. Proc., § 1021.5). The order of May 13, 1982, awarding attorney fees and costs is affirmed.

Kline, P. J., and Rouse, J., concurred.