[S.F. No. 24852. Oct. 17, 1985.]

L. A. PATTON, Plaintiff and Appellant, v.
CITY OF ALAMEDA, Defendant and Respondent.

COUNSEL

Ronald A. Zumbrun, John H. Findley, Joseph E. Maloney and Thomas W. Birmingham for Plaintiff and Appellant.

Carter J. Stroud, City Attorney, for Defendant and Respondent.

OPINION

**MOSK, J.**—Subdivision (a) of section 1, article XIII A of the California Constitution (hereinafter subdivision (a)), enacted by initiative of the People in 1978, limits ad valorem taxes on real property to 1 percent of full cash value. Subdivision (b) of the same section (hereinafter subdivision (b)), excepts from this limitation "ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters" prior to the effective date of the section.[1] Since 1937, section 16-2 of the Charter of the City of Alameda (city) has contained a requirement that the city council must provide for a tax of seven cents on each one hundred dollars of assessed valuation for the support of the city's libraries.[2] The only issue in this case is whether the exemption for "indebtedness" contained in subdivision (b) applies to the levy mandated by section 16-2, so that the library tax may be imposed in addition to the 1 percent ad valorem tax authorized by subdivision (a).

Plaintiff is a resident and property owner of the city. His property tax bill for fiscal year 1982-1983 included an override of .07 percent or $7.26 for the library tax. This tax was in addition to the 1 percent ad valorem tax on the full cash value of his property allowed by subdivision (a).[3] The proceeds

---

[1]Article XIII A, section 1, provides as follows: "(a) The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The One percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties.

"(b) The limitation provided for in subdivision (a) shall not apply to ad valorem taxes or special assessments to pay the interest and redemption charges on any indebtedness approved by the voters prior to the time this section becomes effective."

[2]Section 16-2 provides: "On or before the second Monday in May of each year, the Library Board shall submit to the Council an itemized budget of the amount of money necessary for the administration of the Library System of the City during the next ensuing fiscal year. To the extent of seven cents on each one hundred dollars of assessed valuation, the Council shall, and as to any excess thereover set forth in such estimate the Council may, include in the next succeeding tax levy and apportion to the Library Fund as received moneys for the purposes set forth in such budget."

[3]The actual levy for the library tax was one-fourth of seven cents. The assessment practice at the time section 16-2 was adopted was to assess only one-fourth of the cash value of property. Under subdivision (a), the assessment is calculated on the "full cash value," which is 100 percent of fair market value. The tax rate, as reflected on plaintiff's tax bill was therefore .0175 percent.

of the tax, approximately $250,000, were deposited into a fund used to defray a portion of the operating expenses of the library. Most of the costs were paid by other tax revenues and library fines. Plaintiff sought a refund of the $7.26 paid as an override, on behalf of himself and others similarly situated. When the city denied the refund, he filed this action seeking a refund for himself and other taxpayers, and declaratory relief. He asserts that the tax is invalid because it exceeds the 1 percent limitation set forth in subdivision (a) and is not exempt from that limitation as an indebtedness within the meaning of subdivision (b). The trial court rendered judgment to the city, and plaintiff appeals.

In *Carman* v. *Alvord* (1982) 31 Cal.3d 318 [182 Cal.Rptr. 506, 644 P.2d 192], we considered the question whether an ad valorem tax levied in excess of 1 percent of cash value was an indebtedness approved by the voters, as defined in subdivision (b). The tax was used to meet the city's obligation to provide a pension to its employees. Many years before the enactment of article XIII A, the voters had approved a ballot measure to levy and collect a tax for that purpose, and to enter into a contract with the Public Employees Retirement System (PERS) to receive the contribution and administer the retirement system. We held that the payments made by the city to PERS were a debt within the meaning of subdivision (b), defining the term "any indebtedness" in that provision broadly so as to encompass "all obligations to pay money." (*Id.* at p. 328.) ▪ The opinion declares, "'The term "indebtedness" has no rigid or fixed meaning, but rather must be construed in every case in accord with its context.' [Citations.] It can include all financial obligations arising from contract . . . and it encompasses 'obligations which are yet to become due as [well as] those which are already matured.'" (*Id.* at pp. 326-327.) Our holding was extended to include not only employees who had entered employment in reliance on the pension provisions and who had served the city on that basis before 1978, but also those hired after article XIII A became effective, on the ground that the voters had approved the indebtedness and had "obviously understood that subsequently hired employees too would be covered." (*Id.* at p. 333, fn. 11.)

*Carman* was followed by other cases holding that a city's obligation to pay a pension to its employees constitutes a debt under subdivision (b). In the most recent of these cases, *City of Fresno* v. *Superior Court* (1984) 156 Cal.App.3d 1137 [202 Cal.Rptr. 313], a pension plan adopted in a city's charter in 1957, which included the establishment of a fund to finance the system, was held to be an indebtedness. The taxes collected were paid into pension funds created by ordinance. The charter provision also stated that the pensions could not be reduced below the level authorized in 1957. Employees hired after that date were held to be entitled to the benefit of this limitation. (See also *City of Watsonville* v. *Merrill* (1982) 137 Cal.App.3d

185, 192-193 [186 Cal.Rptr. 857]; *Valentine* v. *City of Oakland* (1983) 148 Cal.App.3d 139, 146 [196 Cal.Rptr. 59].)

A number of nonpension obligations approved by the voters before 1978 have also qualified as an indebtedness within the meaning of subdivision (b). Two of these cases, one decided before and one after *Carman*, involved the levy of taxes by local water agencies to meet their obligations to the Department of Water Resources. Under the Burns-Porter Act (Wat. Code, §§ 12930-12944), the costs of building, operating and maintaining the state water project as well as the cost of payment of interest and principal on the bonds issued to pay costs of construction were to be paid from the proceeds of contracts for delivery of water entered into between the Department of Water Resources and local water agencies. Each contract provided that the local agency would use its taxing powers, if necessary, to obtain the funds to make the payments required by the contract.

In *Goodman* v. *County of Riverside* (1983) 140 Cal.App.3d 900 [190 Cal.Rptr. 7], taxpayers protested a levy by a local agency for this purpose. They asserted it violated article XIII A because the agency had not assumed any of the bonded indebtedness incurred by the state to build the state water project, and the voters of the local agency had not approved the contracts requiring that local taxes be levied to meet obligations under the contract. It was held nevertheless that the contract constituted an indebtedness endorsed by the voters because, in approving the Burns-Porter Act, the state's voters necessarily assented to the levy of property taxes by local water agencies as the source of the funds for payment for the state water project. In *Kern County Water Agency* v. *Board of Supervisors* (1979) 96 Cal.App.3d 874 [158 Cal.Rptr. 430], a similar contract, which was approved by the local voters, was held to be a debt under subdivision (b).

*County of Shasta* v. *County of Trinity* (1980) 106 Cal.App.3d 30 [165 Cal.Rptr. 18], involved the obligation of a county pursuant to approval of the voters prior to 1978, to pay a junior college district an annual charge for the use of the district's facilities and to levy a tax to pay the charge. The district was a successor to a prior junior college district that had been reorganized. The county refused to pay the charge or levy the tax therefor on the ground that it was prohibited from doing so by article XIII A, since it had not assumed the bonded indebtedness of the old district. It was found that the county had entered into an arrangement "in the nature of a contract" and that the voters had assumed an indebtedness as defined in subdivision (b) when they agreed to pay the annual charge and to levy a tax for its payment. (See also *Metropolitan Water District* v. *Dorff* (1979) 98 Cal.App.3d 109 [159 Cal.Rptr. 211].)

Plaintiff argues that these cases are distinguishable because each involved a financial obligation assumed by the taxing authority to a separate

government entity, whereas in the present case the library board that administers the library is not a separate body but only one department of the city, like the police department or the fire department. The city cannot owe a debt to itself, urges plaintiff.

We disagree. While it is undoubtedly a fact that some of the decisions cited above involved a formal contract between separate governmental bodies (e.g., the contract between the local water agency and the Department of Water Resources in *Kern County Water Agency* v. *Board of Supervisors, supra,* 96 Cal.App.3d 874), this is not the fact in all of the cases cited.

In *City of Fresno* v. *Superior Court, supra,* 156 Cal.App.3d 1137, for example, there is no mention of a contract between the city and city's pension funds into which the payments were made. Even if there had been such a contract, the city's duty to pay into the fund would be just as much an internal obligation as the duty to levy the tax for support of the library in the present case. And, although there was a contract between the city and PERS in *Carman,* we made it clear that the contract was only an efficient means by which the city could discharge its obligation to provide a pension to its employees, and that our conclusion would have been the same if the city had made the pension payments already. The indebtedness referred to in *Carman* was created by the voters' approval of a pension system and a tax levy to support it, not by the contract between the city and PERS to administer the system. In this connection, it is significant that in both of these cases employees hired after article XIII A went into effect were held entitled to the same benefits as those employed at the time the plan was established on the ground that the voters understood when they approved the plan and the tax levy that subsequently hired employees would also be covered.

■ In short, an indebtedness may be created by statute rather than contract. The critical consideration in determining whether a city has created an indebtedness under subdivision (b) is not whether there is a formal contract between a governmental body and a distinct agency to make certain payments, but whether the voters obligated themselves prior to 1978 to make expenditures in the future for a specified purpose.

■ Section 16-2 represents such an obligation. The city's voters undertook a duty to pay a specified tax for the support of the library long before article XIII A was enacted. This promise is just as much an indebtedness as the obligation in *Carman* and *City of Fresno* to establish and fund a pension system for existing and future employees.

Plaintiff relies on language in *Carman* that our holding there "provides no authority for governments to tax beyond the set limit for their day-to-day expenses" (31 Cal.3d at p. 334), and argues that since the tax override

was used for general operating expenses of the library, the levy violates this limitation. But this statement, viewed in context, was merely a shorthand way of saying that the 1 percent limitation in subdivision (a) cannot be exceeded unless authorized by another provision of article XIII A. The statement is qualified by the phrase "beyond the set limit," which is explained in the following sentence. We said that our holding "simply recognizes that the indebtedness for which article XIII A expressly allows added taxation includes the important obligations cities incurred when, with specific tax authority provided by the voters before July 1, 1978, they instituted pension plans for their employees." (*Id.* at p. 334.) Read together, these two sentences mean that the 1 percent limit on ad valorem property taxes set forth in subdivision (a) is binding on governmental bodies except to the extent allowed by subdivision (b).

Another contention made by plaintiff is that the purpose of section 16-2 was to establish minimum funding for the library system, and that this may be achieved even if the levy is held to violate article XIII A. That is, the city can comply with the requirement for minimum funding by using the ad valorem taxes authorized by subdivision (a) to support the library at the rate set forth in section 16-2 at a minimum.

While this contention has surface appeal, the issue is not whether the city can comply with section 16-2 without imposing the override tax, but whether it must do so. In the pension cases discussed above, the money for funding the pensions might also have come from the 1 percent ad valorem tax levied under subdivision (a). Yet the fact that the voters had obligated themselves to establish a pension system and to tax themselves to fund it before article XIII A became effective was held to allow imposition of a tax in addition to the 1 percent allowed by subdivision (a).

Plaintiff's final argument is that if we approve the library levy involved in this case as an indebtedness under subdivision (b), local governments would be permitted to exceed the 1 percent ceiling established by subdivision (a) for practically any expenditure. He points out that the charter requires the city to establish police, fire, and other departments, and creates numerous boards in addition to the library board. He maintains that if the city's obligation to provide minimum funding to the library is held to be an indebtedness within the meaning of subdivision (b), then so would the obligation to provide the services of those departments, and the city could fund practically all of its activities with property taxes in excess of the 1 percent ceiling established by subdivision (a).

But section 16-2 does not provide only that the city should carry out a certain function; it obligates the city to levy an ad valorem tax at a certain rate for the support of the library, and this obligation constitutes an indebtedness. Moreover, the fact that the indebtedness must have been approved

before the 1978 effective date of article XIII A circumscribes a governmental body's ability to avoid the 1 percent limitation. Courts have not hesitated to invalidate a tax override on the ground that the indebtedness was approved by the voters after the effective date of article XIII A. (*City of Fresno* v. *Superior Court, supra,* 156 Cal.App.3d 1137, 1146-1147; *Valentine* v. *City of Oakland* (1983) 148 Cal.App.3d 139, 147-148 [196 Cal.Rptr. 59].)[4]

*Carman* declares that subdivision (b) expressed a concern that "irrevocable, long-term obligations, solemnly approved by local electorates and entered on faith in taxing powers then available, not be frustrated by a revolutionary tax limitation imposed from outside the community." (31 Cal.3d at p. 328.) The tax assessed in this case is such an obligation.

The judgment is affirmed.

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

**KAUS, J.,**[*] Dissenting.—In light of the goals of Proposition 13, I do not understand how the charter provision at issue in this case can be found to create an "indebtedness" within the meaning of the subdivision (b) exemption from the 1 percent tax limitation. Proposition 13's primary objective was to limit the amount of property tax local governmental entities could levy for their general operating expenses. As we observed in *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 334 [182 Cal.Rptr. 506, 644 P.2d 192], subdivision (b) "provides no authority for governments to tax beyond the set limit for their day-to-day expenses." Yet, if the library tax mandated by the charter provision here qualifies as an "indebtedness" for purposes of the exemption, there is no logical reason why similar levies for police, fire, parks, and all other governmental services would not also be exempt from the initiative's 1 percent ceiling. Under the reasoning of the majority opinion, so long as a city charter—or perhaps even a local ordinance—expressly mandates future property tax levies in any amount, the city would be permitted by operation of Proposition 13 to levy a 1 percent property tax over and above the mandated levies. Clearly, that is not what the voters had in mind in enacting Proposition 13.

The fundamental flaw in the majority's analysis is its failure to come to terms with the purpose of the "indebtedness" exemption. Recognizing that

---

[4]*City of Fresno* and *Valentine* upheld those pension obligations approved by the voters before the effective date of article XIII A, while striking down others which had not been approved before that date.

[*]Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

in some circumstances local entities were "locked in" to debt that required specified tax levies, the initiative provided for an exemption from the 1 percent limitation to the extent of such unavoidable and irrevocable debts.

However flexible the term "indebtedness" has become,[1] the obligation created by this charter provision simply lacks the essential indicia of an indebtedness. Unlike the various forms of indebtedness involved in previous cases on which the majority relies,[2] the alleged "debt" here is one which the city simply owes to itself and which can be abrogated without violating "vested" constitutional rights or, indeed, any rights of any kind. As the Court of Appeal majority noted, the city's obligation to the library board "is simply a ministerial duty to provide minimum funding for library services. It is an *internal obligation owed to a department of the city and not an indebtedness owed to third persons.*" (Italics added.)

Moreover, the city itself retains the authority to "revoke" the obligation unilaterally, simply by altering the charter provision. Section 16-2 could be

---

[1] In *Carman* we observed that the term "indebtedness" has "no rigid or fixed meaning, but rather must be construed in every case in accord with its context." (31 Cal.3d at p. 326, quoting *County of Shasta* v. *County of Trinity* (1980) 106 Cal.App.3d 30, 39 [165 Cal.Rptr. 18].) However, we were not thereby endorsing a purely nominalist approach to the term. Rather, we were responding to plaintiff's argument that subdivision (b) "seeks to exempt only traditional, fixed, long-term debt for borrowed funds." (*Id.* at p. 325.) And in *County of Shasta, supra,* the court was responding to the contention that the term "indebtedness" in subdivision (b) meant "bonded indebtedness"—a narrow reading which the Court of Appeal in that case properly rejected.

[2] Most of the cases cited involved a levy of an ad valorem tax in excess of the 1 percent limitation in order to meet a city's obligation to a retirement system. (*Carman, supra; City of Fresno* v. *Superior Court* (1984) 156 Cal.App.3d 1137 [202 Cal.Rptr. 313]; *Valentine* v. *City of Oakland* (1983) 148 Cal.App.3d 139 [196 Cal.Rptr. 59]; *City of Watsonville* v. *Merrill* (1982) 137 Cal.App.3d 185 [186 Cal.Rptr. 857].) In *Carman* we emphasized "the employer's duty to employees to pay pensions promised and earned": "By entering public service an employee obtains a vested contractual right to earn a pension on terms substantially equivalent to those then offered by the employer. . . . Earned benefits are deferred compensation [citation omitted] and, when payable, become a fixed indebtedness of the employer. [¶] . . . Contributions to [the State Employees' Retirement System] are in the nature of insurance premiums . . .; during the contract term they represent the employer's ongoing share of the actuarial equivalent of amounts necessary to fund current and future benefits due covered employees, statewide. . . . From premiums paid by all, PERS discharges each employer's indebtedness as it arises. . . . [¶] . . . Contributions to PERS are an efficient means of discharging City's pension debts; *the debts, as approved by the voters, continue to accrue regardless of participation in the state system.*" (31 Cal.3d at pp. 325-326, italics added.) The retirement system exists for the benefit of employees; the city's obligation to the pension fund constitutes an indebtedness to an entity other than itself. This is true, also, of the other situations in which courts have found an "indebtedness" within the meaning of subdivision (b). (*County of Shasta, supra,* 106 Cal.App.3d 30 [ad valorem tax levied to meet county's obligation to a joint community college district]; *Goodman* v. *County of Riverside* (1983) 140 Cal.App.3d 900 [190 Cal.Rptr. 7] [ad valorem taxes levied by local water agency to meet its contractual obligations to the California Department of Water Resources]; *Kern County Water Agency* v. *Board of Supervisors* (1979) 96 Cal.App.3d 874 [158 Cal.Rptr. 430] [obligation to California Department of Water Resources].)

repealed or amended at any time without any approval from the library board. It is a curious debt which the debtor can cancel at will. In *Carman* we noted that subdivision (b)'s focus on voter approval "implies a concern that *irrevocable,* long-term obligations" (31 Cal.3d at p. 328, italics added) not be frustrated by revolutionary tax limitation measures—the obligation created by section 16-2 is clearly not "irrevocable" in any sense.

All this aside, I note that the effect of the majority opinion promises to be quite limited. During the pendency of this case, the Governor signed into law a measure which prohibits local governments from levying taxes such as this in the future. (Stats. 1985, ch. 112, § 3, subds. (a)(5), (b).)[3]

Grodin, J., and Lucas, J., concurred.

---

[3]The new measure allows the continued imposition of such taxes, if they were first imposed prior to the 1982-1983 fiscal year—the particular levy before us is therefore apparently unaffected: "SEC. 3. Section 97.65 is added to the Revenue and Taxation Code, to read: [¶] 97.65. (a) For the 1985-86 fiscal year and each fiscal year thereafter, no jurisdiction shall impose a property tax rate pursuant to subdivision (a) of Section 93 [codifying the voter-approved debt provision of Proposition 13], unless it is imposed for one or more of the following purposes: [¶] . . . (5) To make payments in support of paramedic, library, or zoo programs approved by the voters before July 1, 1978, provided that the jurisdiction imposed the property tax rate in the 1982-83 fiscal year. [¶] . . . (b) In the 1985-86 fiscal year and any fiscal year thereafter, a jurisdiction shall not impose a property tax rate, pursuant to subdivision (a) of Section 93, in excess of the rate it imposed in the 1982-83 or 1983-84 fiscal year. Notwithstanding the limit imposed by this subdivision, a higher property tax rate may be imposed whenever necessary to make payments for any of the purposes specified in paragraphs (1), (2), and (3) of subdivision (a). However, no property tax rate increase in excess of the rate imposed in the 1984-85 fiscal year shall be imposed if the purpose of the rate increase is to fund a reduction in the rates charged for water at the time of the property tax rate increase."