Filed 11/3/16

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF SAN JOSE, as Successor Agency, etc., | C074539 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2012-80001190-CU-WM-GDS) |
| v. | |
| VINOD K. SHARMA, as Director, etc., et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Allen Sumner, Judge.  Affirmed with directions.

Richard Doyle, City Attorney, Nora Frimann, Assistant City Attorney, Ardell Johnson and Margo Laskowska, Deputy City Attorneys for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Constance L. LeLouis and Aaron Jones, Deputy Attorneys General for California Department of Finance as Amicus Curiae on behalf of Plaintiff and Appellant.

Remcho, Johansen & Purcell, Robin B. Johansen, Karen Getman, Harry Berezin; Orry P. Korb, County Counsel, and Steve Mitra, Assistant County Counsel for Defendants and Appellants.

This dispute is over who is entitled to real property tax increment revenue after the statutory dissolution of the San Jose Redevelopment Agency. The trial court held that tax increment revenue from a real property tax imposed to raise funds for the pension obligations of Santa Clara County is properly distributed to the Redevelopment Property Tax Trust Fund to pay the debts of the former redevelopment agency. Santa Clara County, with its Director of Finance Vinod K. Sharma, contends on appeal that this holding was erroneous. The trial court also held that statutes dissolving the former redevelopment agency require that certain tax increment revenue be passed through from the Redevelopment Property Tax Trust Fund to Santa Clara County instead of being used to meet the enforceable obligations of the former redevelopment agency. The City of San Jose, as the successor of the redevelopment agency, contends on appeal that this holding was erroneous. Thus, both parties appeal.

We conclude that the trial court did not err.

BACKGROUND

Some history of real property taxation, public finances, and redevelopment in California and Santa Clara County will provide the framework for our discussion of the issues presented in this case.

In 1944, Santa Clara County voters approved Measure 13. The new law authorized Santa Clara County (the County) to participate in what eventually became the California Public Employees Retirement System. To finance this participation, the new law imposed "a special tax sufficient to raise the amount required to provide sufficient revenue," which tax we refer to in this opinion as the retirement levy. This retirement levy is an ad valorem tax on real property in the County, or, in other words, a tax calculated as a percentage of the real property's assessed value. While that percentage has varied over the years, in recent years it has been .0338 percent, which means that, for every $1,000 in assessed value, the retirement levy imposes a tax of 33.8 cents on real property in the County.

2

In 1945, the California Legislature authorized local governments to create redevelopment agencies to revitalize blighted communities. These agencies had authority to acquire real property through purchase and eminent domain, dispose of property, build infrastructure, and improve public facilities in the agency's project area. But funding for the agencies was scarce because they had no power to levy taxes. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245-246 (*Matosantos*).)

In 1952, California voters adopted Proposition 18[1] to fund redevelopment agencies. This initiative created what eventually became article XVI, section 16 of the California Constitution. The effect of this provision is to give to the redevelopment agency the ad valorem tax receipts resulting from the increase of real property value in the redevelopment area. This "tax increment financing," along with the effect of Proposition 13[2] adopted by the voters in 1978, was described by the California Supreme Court in *Matosantos*:

"Under [the tax increment financing] method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the redevelopment agency for repayment of debt incurred to finance the project. (Cal. Const., art. XVI, § 16, subds. (a), (b); [Health & Saf. Code,] § 33670, subds. (a), (b); [citation].) In essence, property tax revenues for entities other than the redevelopment agency are frozen, while revenue from

---

[1] California Constitution, article XIII, former section 19, added by initiative, General Election (Nov. 4, 1952) (Proposition 18).

[2] California Constitution, article XIII A, section 1, added by Proposition 13, as approved by voters, Primary Election (June 6, 1978) (Proposition 13).

3

any increase in value is awarded to the redevelopment agency on the theory that the increase is the result of redevelopment.  [Citation.]

"The property tax increment revenue received by a redevelopment agency must be held in a special fund for repayment of indebtedness ([Health & Saf. Code,] § 33670, subd. (b)), but the law does not restrict the amount of tax increment received in a given year to that needed for loan repayments in that year.  [Citation.]  The only limit on the annual increment payment received is that it may not exceed the agency's total debt, less its revenue on hand.  ([Health & Saf. Code,] § 33675, subd. (g).)  Once the entire debt incurred for a project has been repaid, all property tax revenue in the project area is allocated to local taxing agencies according to the ordinary formula.  ([Health & Saf. Code,] § 33670, subd. (b).)

"A powerful and flexible tool for community economic development, tax increment financing nonetheless 'has sometimes been misused to subsidize a city's economic development through the diversion of property tax revenues from other taxing entities . . . .'  [Citations.]  This practice became more common in the era of constricted local tax revenue that followed the passage of Proposition 13.  Some small cities with blighted areas available for industrial redevelopment 'were able to shield virtually all of their property tax revenue from other government agencies,' but '[e]ven in ordinary cities . . . the temptation to use redevelopment as a financial weapon was considerable.  Because it limited increases in property tax rates, Proposition 13 created a kind of shell game among local government agencies for property tax funds.  The only way to obtain more funds was to take them from another agency.  Redevelopment proved to be one of the most powerful mechanisms for gaining an advantage in the shell game.'  [Citation.] . . .  [Citation.]

"Addressing these concerns, the Legislature has required redevelopment agencies to make certain transfers of their tax increment revenue for other local needs.  First, 20 percent of the revenue generally must be deposited in a fund for provision of low- and

4

moderate-income housing. ([Health & Saf. Code,] §§ 33334.2, 33334.3, 33334.6; [citation].) Second, redevelopment agencies must make a graduated series of pass-through payments to local government taxing agencies such as cities, counties, and school districts from tax increment on projects adopted or expanded after 1994. ([Health & Saf. Code,] § 33607.5, subd. (a)(2); [citation].) The payments are distributed according to the taxing agencies' ordinary shares of property taxes. [Citation.]" (*Matosantos, supra,* 53 Cal.4th at pp. 246-248, italics omitted.)

In 1956, the City of San Jose established the San Jose Redevelopment Agency, which began receiving tax increment revenue. The agency used its future entitlement to tax increment as security for debt incurred for redevelopment projects. Since 1956, all tax increment revenue associated with the retirement levy in the agency's project area has been distributed to the redevelopment agency.

The continued imposition of the retirement levy, which is an ad valorem real property tax over and above Proposition 13's one percent limitation, is legal because it was imposed to pay for "[i]ndebtedness" incurred before July 1, 1978, which is an exception to Proposition 13's one percent limitation. (Cal. Const., art. XIII A, § 1, subd. (b)(1).)

In 1986, California voters approved Proposition 62,[3] which added sections 53722 and 53723, among others, to the Government Code. Government Code section 53722 prevented local governments from imposing a special tax without the approval of a two-thirds majority of the local voters. Similarly, Government Code section 53723 prevented local governments from imposing a general tax without the approval of a simple majority

---

[3] Added by initiative measure, approved by the electorate, General Election (Nov. 4, 1986) (Proposition 62).

5

of the local voters.  In 1996, California voters approved Proposition 218,**4** adding article XIII C to the California Constitution, which placed in the Constitution what the voters had done concerning special and general taxes with Proposition 62 in 1986.  (Cal. Const., art. XIII C, § 2, subds. (b) & (d).)

Finally, in 2011, the California Legislature dissolved redevelopment agencies and provided for successor agencies to wind down the affairs of the redevelopment agencies.  This dissolution law is well described elsewhere.  (See *Matosantos, supra,* 53 Cal.4th at pp. 250-252.)  In this case, the City of San Jose is the successor agency of the San Jose Redevelopment Agency.  We refer to the City of San Jose as the successor agency in the remainder of this opinion.

In the process of winding down the affairs of the San Jose Redevelopment Agency, the successor agency and County disagreed on two issues, framed by the trial court as follows:  (1)  "Is the City, successor agency to the San Jose Redevelopment Agency, entitled to receive the tax increment portion of the property tax levied in 1944 to fund the County's retirement obligations [(the retirement levy)]?"  And (2) "Is revenue that would be allocated to the County pursuant to a 'passthrough agreement' between the County and former redevelopment agency subject to payment of ***any*** debt of the redevelopment agency, or only as needed to pay the agency's ***bond*** debt?"  (Original bold text and italics.)  The trial court responded that (1) the successor agency is entitled to the tax increment portion of the retirement levy to put toward the winding down of the former redevelopment agency, and (2) tax increment revenue not needed to pay bond debt of the former redevelopment agency is subject to the passthrough agreement, meaning that, instead of being used to pay nonbond debt of the former redevelopment

---

**4**    California Constitution, article XIII C, section 1, added by Proposition 218, adopted by voters, General Election (Nov. 6, 1996) (Proposition 218).

agency, the tax increment revenue not needed to pay bond debt is to be passed through to the County.

Instead of distributing tax increment revenue associated with the retirement levy, the County retained those disputed funds and impounded them pending resolution of this litigation.

The County and the successor agency each filed a notice of appeal from the trial court's judgment on the successor agency's petition for writ of mandate and the County's cross-petition for writ of mandate. The County contends the trial court erred on the first issue, concerning the tax increment revenue on the retirement levy, and the successor agency contends the trial court erred on the second issue, concerning what tax increment revenues were to pass through to the County.[5]

## STANDARD OF REVIEW

The parties agree that the facts are undisputed, and that we must independently apply statutory and constitutional law to determine whether the trial court was correct. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.)

"The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] 'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' [Citations.] Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are

---

[5] The California Department of Finance filed an amicus brief supporting the argument of the successor agency (and the finding of the trial court) that the tax increment revenue from the retirement levy is properly allocated to pay the enforceable obligations of the former redevelopment agency. The Department of Finance, however, takes no position on the trial court's resolution of the other issue involving the passthrough agreement.

7

clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.)

The same rules apply generally to our interpretation of the California Constitution. We endeavor to ascertain and effectuate the voters' intent. (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 212.)

DISCUSSION

I

*Retirement Levy*

The County contends the trial court erred by finding that the tax increment revenue associated with the retirement levy in the redevelopment project area must be allocated to the successor agency. The County argues that, because the retirement levy is a special tax, it can be used only for the purpose for which it was enacted—that is, to meet the County's retirement obligations with the California Public Employees' Retirement System (CalPERS). We disagree. The tax increment revenue associated with the retirement levy is properly distributed to the successor agency under section 16 of article XVI of the California Constitution (section 16).

A.     *Application of Section 16*

Section 16 provides in relevant part that the "portion of the levied taxes," referring to the tax increment, "shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed or otherwise) incurred by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project." (§ 16, subd. (b).) Crucially, "the word 'taxes' as used herein includes, but is not limited to, all levies on an ad valorem basis upon land or real property." (§ 16.) The Legislature implemented section 16 without attempting to

8

redefine the word taxes, thus incorporating the constitutional definition. (Health & Saf. Code, § 33670.)

The retirement levy is an ad valorem tax because it is based on the assessed value of the real property. Therefore, section 16, by its terms, applies to tax revenues collected under the retirement levy. And because section 16 applies to tax revenues collected under the retirement levy, the tax increment revenue "shall be allocated to" the redevelopment agency or, as here, its successor, for payment of debts. So the application of section 16 to this case is straightforward and supports the trial court's conclusion that tax increment revenue from the retirement levy is to be allocated to pay the former redevelopment agency's debts.

B. *County's Arguments*

Despite this straightforward application, the County's arguments on appeal consist of urging us to construe this unambiguous constitutional provision differently. Mainly, the County argues that: (1) the retirement levy is a special tax that can be used only to help satisfy the County's retirement obligations, (2) payment of the tax increment portion of the retirement levy to the redevelopment agency or its successor constitutes a prohibited gift of public funds, and (3) diverting retirement levy funds violates the vested rights of county employees. None of these arguments has merit.

1. Special Tax

Under Proposition 218, approved in 1996, " '[s]pecial tax' means any tax imposed for specific purposes . . . ." (Cal. Const., art. XIII C, § 1, subd. (d).) The retirement levy is therefore a special tax, as that term is currently defined.

As chronicled above, California voters approved Proposition 62 in 1986, which added Government Code section 53724, subdivision (e), among other provisions. That subdivision provides: "The revenues from any special tax shall be used only for the purpose or service for which it was imposed, and for no other purpose whatsoever." (Gov. Code, § 53724, subd. (e).)

9

This provision of the Government Code would appear to support the County's argument that the retirement levy, as a special tax, may be used only for meeting the County's retirement obligations. However, this provision, though adopted by the voters, is a statute, and statutes cannot amend the Constitution. (*Smith v. Fair Employment & Hous. Com.* (1996) 12 Cal.4th 1143, 1187, fn. 4.) Section 16, which applies to *all* ad valorem taxes on real property, without regard to whether the tax is a general or special tax, prevails over Government Code section 53724, subdivision (a).

Also as chronicled above, Proposition 218 placed in the Constitution Proposition 62 with respect to votes necessary to imposing taxes, but it did not include the provision limiting the purpose for which revenues from a special tax may be used. In other words, Government Code section 53724, subdivision (e) did not become a constitutional provision. The fact that Proposition 218 distinguished between new general and special taxes in mandating their manner of approval does not logically lead to the conclusion that a special tax such as the retirement levy, passed many years earlier, cannot also be used to pay the obligations of a redevelopment agency.

To the extent section 16 provided the mechanism for using tax increment revenue to pay the obligations of a redevelopment agency, the tax increment revenue, even of what originated as a special tax such as for the purpose of meeting a local government's retirement obligations, is converted by law to a tax, whether special or general is beside the point, to pay the debts of the redevelopment agency. From that standpoint, there is no problem of whether the funds are being used for the designated purpose because the designated purpose of the tax increment revenue is to pay the debts of the redevelopment agency.

The County also asks us to look to the ballot arguments in favor of Proposition 18, which is the 1952 initiative that eventually became section 16, to determine whether the tax increment provisions were meant to apply to special taxes. But we need not do so because the language of the constitutional provision is not ambiguous. It applies to "all

10

levies on an ad valorem basis upon land or real property." (§ 16.)  This includes the retirement levy.

Finally, the County claims that the dissolution law somehow recognized that special taxes such as the retirement levy are not included in the tax increment revenue used to pay the debts of the former redevelopment agencies.  The County focuses on two provisions of the dissolution law that require that tax increment revenues necessary to pay the debts of the former redevelopment agency be directed to pay those debts but that tax increment revenues not needed to meet the enforceable obligations of the former redevelopment agency be redirected to the usual recipients of property tax revenues. (Health & Saf. Code, §§ 34172, subd. (d); 34182, subd. (c).)[6]  The language of those provisions refers to real property taxes collected under Proposition 13's one percent limitation on real property taxes (Cal. Const., art. XIII A, § 1, subd. (a)), not under the exception to the one percent limitation into which the retirement levy falls for

---

[6]     Health and Safety Code section 34172, subdivision (d) provides:

"Revenues equivalent to those that would have been allocated pursuant to subdivision (b) of Section 16 of Article XVI of the California Constitution shall be allocated to the Redevelopment Property Tax Trust Fund of each successor agency for making payments on the principal of and interest on loans, and moneys advanced to or indebtedness incurred by the dissolved redevelopment agencies.  Amounts in excess of those necessary to pay obligations of the former redevelopment agency shall be deemed to be property tax revenues within the meaning of subdivision (a) of Section 1 of Article XIII A of the California Constitution."

Health and Safety Code section 34182, subdivision (c)(1) provides, in part:

"The county auditor-controller shall determine the amount of property taxes that would have been allocated to each redevelopment agency in the county had the redevelopment agency not been dissolved pursuant to the operation of the act adding this part.  These amounts are deemed property tax revenues within the meaning of subdivision (a) of Section 1 of Article XIII A of the California Constitution and are available for allocation and distribution in accordance with the provisions of the act adding this part."

11

indebtedness approved by voters before Proposition 13 was passed (Cal. Const., art. XIII A, § 1, subd. (b)(1)). According to the County, this reference to the one percent limitation showed the Legislature's recognition that the tax increment revenue from special taxes, such as the retirement levy, cannot be used to meet the enforceable obligations of the former redevelopment agencies because the retirement levy is an exception to the one percent limitation of Proposition 13.

We disagree with the County that the Legislature's reference to tax increment revenue associated with the one percent limitation of Proposition 13 provides any evidence that the Legislature recognized a difference between general and special taxes in allocating money to pay the debts of the former redevelopment agencies. As discussed above, section 16, which provides funding for redevelopment agencies, applies to "all levies on an ad valorem basis upon land or real property," including to tax revenues collected under the retirement levy, with no distinction between general and special taxes. Furthermore, the provisions of the dissolution law cited by the County do not purport to change what tax increment revenue is available to pay the debts of a former redevelopment agency.

In summary, nothing in the law concerning special taxes prohibits distribution of the tax increment portion of the retirement levy to the successor agency to pay the former redevelopment agency's debts.

2. Gift of Public Funds

The County's argument that use of tax increment revenue associated with the retirement levy constitutes an unconstitutional gift of public funds fails because those funds never belonged to the County. The tax increment portion of the retirement levy was collected within the former redevelopment agency's project area, by law, for the purpose of paying the obligations of the redevelopment agency.

12

"The Legislature shall have no power to . . . make any gift or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever . . . ." (Cal. Const., art. XVI, § 6.)

Interpreting this constitutional provision, the California Supreme Court has held: "[A] contribution from one public agency to another for a purely local purpose of the donee agency is in violation of the constitutional prohibition, but . . . such a contribution is legal if it serves the public purpose of the donor agency even though it is beneficial to local purposes of the donee agency." (*Santa Barbara etc. Agency v. All Persons* (1957) 47 Cal.2d 699, 707, revd. on other grounds, *Ivanhoe Irrigation Dist. v. McCracken* (1958) 357 U.S. 275 [2 L.Ed.2d 1313], mod., *Santa Barbara County Water Agency v. All Persons & Parties* (1960) 53 Cal.2d 743.)

The County asserts that distributing the tax increment portion of the retirement levy to the successor agency to pay debts of the former redevelopment agency is a gift of public funds from the County to the successor agency. To the contrary, the tax increment portion of the retirement levy has, since 1956, been a tax on real property within the former redevelopment agency's project area to finance redevelopment in that area. The tax increment portion of the retirement levy never belonged to the County.

The cases cited by the County do not support the County's position.

For example, in *City of Oakland v. Garrison* (1924) 194 Cal. 298, the California Supreme Court held that use of Alameda County funds to improve a road in the City of Oakland did not constitute a prohibited gift of public funds because the funds were to be devoted to a public purpose and improvement of the street within the city is of general interest to the county. (*Id*. at pp. 303-305.) Here, the situation is similar in that redevelopment in the City is a public purpose and is of general interest to the County. Thus, there is no prohibited gift of funds, even if we assume that the tax increment portion of the retirement levy ever belonged to the County.

13

In *Golden Gate Bridge etc. Dist. v. Luehring* (1970) 4 Cal.App.3d 204, the Golden Gate Bridge and Highway District had surplus funds that the district's directors desired to transfer to the counties in the district, but the district's general manager and auditor opposed the transfer. (*Id*. at p. 206.) The Court of Appeal concluded that distribution of the surplus funds to the counties would be a prohibited gift of public funds because there was no showing the transfer of the funds "would promote the interests of the district in any substantial way." (*Id*. at p. 211.) Here, we need not determine whether the successor agency's use of the tax increment portion of the retirement levy would promote the interests of the County because, by law, that portion of the retirement levy was collected to pay the obligations of the former redevelopment agency. Again, it never belonged to the County, and it was not collected to meet the County's retirement obligations.

Finally, the County argues that our interpretation "assume[s] that [section 16] impliedly repealed the constitutional and common law principles [referring to restrictions on special taxes and gifts of public funds]." To the contrary, we conclude that our interpretation is not in conflict with those restrictions; therefore, there is no repeal-by-implication argument to be considered.

### 3.     County Employees' Vested Rights

The County argues that "diversion of retirement levy funds violates the vested rights of County employees." (Unnecessary capitalization omitted.) This argument suffers from the same flaw as the other arguments—the tax increment portion of the retirement levy was never designated to meet the County's retirement obligations. By law, the tax increment portion has always been designated to meet the obligations of the former redevelopment agency. Since it has always been designated to meet the obligations of the former redevelopment agency, County employees are not entitled to those funds.

In any event, use of the tax increment portion of the retirement levy to pay the obligations of the former redevelopment agency does not impair any vested rights of

14

County employees because the County has failed to show any actual impairment of any vested right. "A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment. Such a pension right may not be destroyed, once vested, without impairing a contractual obligation of the employing public entity. [Citation.]" (*Betts v. Board of Administration of Public Employees' Retirement System* (1978) 21 Cal.3d 859, 863.) To support a claim that a public employee's pension rights have been impaired, the proponent of that claim must present "a factual record disclosing . . . present, specific and substantial impairment of [the] contract . . . ." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 241 (*Amador Valley*).)

The County asserts: "Provisions that confer a pension benefit and establish a means to pay for that benefit create vested, contractual rights not only to continuation of benefits, but also to continuation of the funding." To support this broad statement, the County cites cases in which the government canceled or reduced the actual payment for the pension benefit. (See *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 787 [funding to CalPERS canceled or reduced]; *Cal. Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 508-512 [funds not appropriated for Teachers' Retirement Fund]; *Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1034-1039 [funding for vested benefit reduced].) These cases are inapposite because distribution of the tax increment portion of the retirement levy does not prevent the County from paying the required amount to CalPERS for the County employees' benefits. The County does not claim that it has failed to make the required payments to CalPERS because of the distribution of the tax increment portion of the retirement levy to the former redevelopment agency. Therefore, there is no actual impairment of the rights of County employees to their pension benefits, even though the tax increment portion of the retirement levy has been distributed to the former redevelopment agency since 1956. (*Amador Valley, supra,* 22 Cal.3d at p. 241.)

15

The County argues, however, that its ability to fund the pension benefits without the entirety of the retirement levy does not mean that the County employees' vested rights to their pension benefit have not been violated. In support of this proposition, the County cites *Patton v. City of Alameda* (1985) 40 Cal.3d 41, 43 (*Patton*). But that case is unhelpful to the County on this issue. In *Patton*, the California Supreme Court was asked to construe part of an exemption to the one percent ad valorem tax found in Proposition 13, which exemption allowed the county to impose an ad valorem tax in addition to the one percent tax. That exemption applied, by the terms of the initiative, if the tax was imposed to pay "[i]ndebtedness" incurred before Proposition 13 was approved. (Cal. Const., art. XIII A, § 1, subd. (b)(1).) The *Patton* court held the "indebtedness" exemption applied to indebtedness incurred before Proposition 13 for library services. (*Patton, supra*, at pp. 43-48.)

In this context, relating to whether the library services tax was exempt from the one percent limitation of Proposition 13, the *Patton* court held:

"[T]he issue is not whether the city can comply with [the provision mandating support of library services] without imposing the override tax [in addition to the one percent tax], but whether it must do so. In [*Patton*], the money for funding the pensions might also have come from the 1 percent ad valorem tax levied under subdivision (a) [of Proposition 13]. Yet the fact that the voters had obligated themselves to establish a pension system and to tax themselves to fund it before article XIII A [of the California Constitution] became effective was held to allow imposition of a tax in addition to the 1 percent allowed by subdivision (a)." (*Patton, supra,* 40 Cal.3d at p. 47.)

Contrary to the County's suggestion, this quote has nothing to do with the vested rights of County employees. Instead, it relates only to whether the county could impose the library services tax over and above Proposition 13's one percent limitation.

16

The County has failed to establish that the distribution of the tax increment portion of the retirement levy to pay the obligations of the former redevelopment agency since 1956 has violated the vested rights of County employees.

## II

### *Priority of Distribution*

The second issue is similarly a question of determining what the text of the law (in this instance, a statute) provides on its face and interpreting the law consistently with that text because the language is unambiguous. This issue relates to how much of the tax increment revenue must be passed through to the County rather than used to meet the enforceable obligations of the former redevelopment agency. We conclude that the trial court properly interpreted the relevant statute, Health and Safety Code section 34183, to require the passthrough to the County.

A.      *Interpretation of Health and Safety Code Provisions*

Under the dissolution law, which includes Health and Safety Code section 34183, the Legislature provided that tax increment funds would be paid into a trust fund called the Redevelopment Property Tax Trust Fund (the trust fund). From the trust fund, the county auditor-controller distributes the funds "for the benefit of the holders of former redevelopment agency enforceable obligations and the taxing entities that receive passthrough payments and distributions of property taxes . . . ." (Health & Saf. Code, § 34182, subd. (c).)

Subdivision (a) of Health and Safety Code section 34183 provides the priority for distribution of tax increment revenue from the trust fund. This priority of distribution is called the "waterfall." Subdivision (b) of the same statute provides for what to do if the trust fund is not large enough to make all the distributions provided for in subdivision (a). This priority of reallocating the distribution because the trust fund is not large enough is called the "reverse waterfall."

17

Subdivision (a) of Health and Safety Code section 34183 provides for the following priority of trust fund allocations (the waterfall):[7]

**7**      Subdivision (a) of Health and Safety Code section 34183 provided:

"(a) Notwithstanding any other law, from February 1, 2012, to July 1, 2012, and for each fiscal year thereafter, the county auditor-controller shall, after deducting administrative costs allowed under Section 34182 and Section 95.3 of the Revenue and Taxation Code, allocate moneys in each Redevelopment Property Tax Trust Fund as follows:

"(1)  Subject to any prior deductions required by subdivision (b), first, the county auditor-controller shall remit from the Redevelopment Property Tax Trust Fund to each local agency and school entity an amount of property tax revenues in an amount equal to that which would have been received under Section 33401, 33492.140, 33607, 33607.5, 33607.7, or 33676, as those sections read on January 1, 2011, or pursuant to any passthrough agreement between a redevelopment agency and a taxing entity that was entered into prior to January 1, 1994, that would be in force during that fiscal year, had the redevelopment agency existed at that time. The amount of the payments made pursuant to this paragraph shall be calculated solely on the basis of passthrough payment obligations, existing prior to the effective date of this part and continuing as obligations of successor entities, shall occur no later than May 16, 2012, and no later than June 1, 2012, and each January 2 and June 1 thereafter. Notwithstanding subdivision (e) of Section 33670, that portion of the taxes in excess of the amount identified in subdivision (a) of Section 33670, which are attributable to a tax rate levied by a taxing entity for the purpose of producing revenues in an amount sufficient to make annual repayments of the principal of, and the interest on, any bonded indebtedness for the acquisition or improvement of real property shall be allocated to, and when collected shall be paid into, the fund of that taxing entity. The amount of passthrough payments computed pursuant to this section, including any passthrough agreements, shall be computed as though the requirement to set aside funds for the Low and Moderate Income Housing Fund was still in effect.

"(2)  Second, on June 1, 2012, and each January 2 and June 1 thereafter, to each successor agency for payments listed in its Recognized Obligation Payment Schedule for the six-month fiscal period beginning January 1, 2012, and July 1, 2012, and each January 2 and June 1 thereafter, in the following order of priority:

"(A)  Debt service payments scheduled to be made for tax allocation bonds.

18

1. Administrative costs incurred by the auditor-controller in administering the dissolution law.

2. Statutory and contractual passthroughs.  The passthrough at issue in this case is the result of an agreement between the former redevelopment agency and the County.

3. Payments listed in the Recognized Obligation Payment Schedule (ROPS) prepared by the successor agency.  The ROPS, generally speaking, is a list of the former redevelopment agency's enforceable obligations.  (*City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 299.)

4. Administrative costs of the successor agency.

5. Distributions to local agencies and school entities (other than distributions made under passthrough agreements) that ordinarily receive property tax revenues.  This distribution applies simply to the remainder after the first four priorities are satisfied.

---

"(B)  Payments scheduled to be made on revenue bonds, but only to the extent the revenues pledged for them are insufficient to make the payments and only if the agency's tax increment revenues were also pledged for the repayment of the bonds.

"(C)  Payments scheduled for other debts and obligations listed in the Recognized Obligation Payment Schedule that are required to be paid from former tax increment revenue.

"(3)  Third, on June 1, 2012, and each January 2 and June 1 thereafter, to each successor agency for the administrative cost allowance, as defined in Section 34171, for administrative costs set forth in an approved administrative budget for those payments required to be paid from former tax increment revenues.

"(4)  Fourth, on June 1, 2012, and each January 2 and June 1 thereafter, any moneys remaining in the Redevelopment Property Tax Trust Fund after the payments and transfers authorized by paragraphs (1) to (3), inclusive, shall be distributed to local agencies and school entities in accordance with Section 34188."

(Unless otherwise noted, this and other quotations of Health and Safety Code section 34183 reflect the language of the statute as amended in 2012.  (Stats. 2012, ch. 26, § 25.)  The 2012 amendments did not affect the parts of the statute at issue in this case.)

Therefore, if there is no remainder, there is nothing to distribute. (Health & Saf. Code, § 34183, subd. (a).)

Thus, the waterfall provides that the payment to the County under the contractual passthrough agreement has priority over the payments to meet the former redevelopment agency's enforceable obligations listed in the ROPS. But the waterfall assumes that there are sufficient funds to cover the allocations. Here, the parties agree that the tax increment revenue in the trust fund is not sufficient to make all the payments listed in the waterfall. That condition—the trust fund's inability to make all the waterfall payments—brings into play the reverse waterfall, provided for in Health and Safety Code section 34183, subdivision (b).

Subdivision (b) of Health and Safety Code section 34183 deducts the amount of the deficiency from the waterfall in a prescribed order:[8]

---

[8] Subdivision (b) of Health and Safety Code section 34183 provides:

"If the successor agency reports, no later than April 1, 2012, and May 1, 2012, and each December 1 and May 1 thereafter, to the county auditor-controller that the total amount available to the successor agency from the Redevelopment Property Tax Trust Fund allocation to that successor agency's Redevelopment Obligation Retirement Fund, from other funds transferred from each redevelopment agency, and from funds that have or will become available through asset sales and all redevelopment operations, are insufficient to fund the payments required by paragraphs (1) to (3), inclusive, of subdivision (a) in the next six-month fiscal period, the county auditor-controller shall notify the Controller and the Department of Finance no later than 10 days from the date of that notification. The county auditor-controller shall verify whether the successor agency will have sufficient funds from which to service debts according to the Recognized Obligation Payment Schedule and shall report the findings to the Controller. If the Controller concurs that there are insufficient funds to pay required debt service, the amount of the deficiency shall be deducted first from the amount remaining to be distributed to taxing entities pursuant to paragraph (4), and if that amount is exhausted, from amounts available for distribution for administrative costs in paragraph (3). If an agency, pursuant to the provisions of Section 33492.15, 33492.72, 33607.5, 33671.5, 33681.15, or 33688 or as expressly provided in a passthrough agreement entered into pursuant to Section 33401, made passthrough payment obligations subordinate to debt

20

1. The part of the tax increment revenue to be distributed to local agencies and school entities after all other priorities have been satisfied.

2. Administrative costs of the successor agency.

3. Statutory and contractual passthrough agreements, but with a *condition* and a *limitation*. To the extent that funds can be deducted from the statutory and contractual passthrough agreements, they can be applied to the enforceable obligations of the former redevelopment agency listed in the ROPS. (Health & Saf. Code, § 34183, subd. (b).)

The *condition* for deducting a contractual passthrough agreement (the only type of passthrough relevant here) from the deficiency in the waterfall is that the passthrough agreement must be, by its own terms, subordinate to the former agency's payments on enforceable obligations. "If [a redevelopment] agency, . . . as expressly provided in a passthrough agreement . . . , made passthrough payment obligations subordinate to debt service payments required for enforceable obligations, [this provision applies]." (Health & Saf. Code, § 34183, subd. (b).) Here, the contractual passthrough agreement between the County and the former redevelopment agency made payment of passthrough funds to the County subordinate to the former redevelopment agency's other enforceable obligations—its "debt service payments." Thus, the statutory condition for deducting a trust fund deficiency from payment of passthrough funds is met, and tax increment revenue that would have passed through to the County may be used to pay the former redevelopment agency's enforceable obligations listed in the ROPS.

That leaves a determination of what limitation is to be placed on the amount deducted from payment of passthrough funds to pay the former redevelopment agency's

---

service payments required for enforceable obligations, funds for servicing bond debt may be deducted from the amounts for passthrough payments under paragraph (1), as provided in those sections, but only to the extent that the amounts remaining to be distributed to taxing entities pursuant to paragraph (4) and the amounts available for distribution for administrative costs in paragraph (3) have all been exhausted."

enforceable obligations. This is the main dispute between the parties on the passthrough issue. The successor agency asserts there is no limitation to what can be deducted to service the former redevelopment agency's *debt*, while the County argues that only funds sufficient to service the former redevelopment agency's *bond debt* may be deducted. The plain language of the statute supports the County's argument.

When the condition just discussed is met, "funds for servicing bond debt may be deducted from the amounts for passthrough payments under [the waterfall] . . . ." (Health & Saf. Code, § 34183, subd. (b).) The reverse waterfall deduction is limited to "funds for servicing bond debt." The Legislature made this clear. As applied here, it means that only the amount necessary to service the former redevelopment agency's bond debt may be deducted from the amount that passes through to the County under the passthrough agreement.

B.     *Successor Agency's Arguments*

Despite the clarity of the reverse-waterfall provision of Health and Safety Code section 34183, subdivision (b) concerning passthrough agreements, the successor agency argues that we should not apply it as written because (1) the dissolution law favors payment of the former redevelopment agency's enforceable obligations to third parties over passthrough payments to the County, (2) enforcement of the plain language of the provision impairs the contractual rights of third parties, (3) the plain language conflicts with the State Controller's order concerning disbursement of funds, and (4) the contractual passthrough agreement does not support our interpretation (as well as the trial court's interpretation) of the reverse-waterfall provision.

1.     Legislative Intent

The successor agency's first argument, that the plain language of Health and Safety Code section 34183, subdivision (b) is inconsistent with the overall intent of the dissolution law, fails because the plain, unambiguous language is what reflects the Legislature's intent. As we noted recently in another case involving the fallout from the

dissolution of redevelopment agencies, the specific language of a statute must prevail over a general, overarching policy that a party may perceive in the legislation. " '[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law. Where, as here, "the language of a provision . . . is sufficiently clear in its context and not at odds with the legislative history, . . . '[we should not] examine the additional considerations of "policy" . . . that may have influenced the lawmakers in their formulation of the statute.' " ' (*Rodriguez v. United States* (1987) 480 U.S. 522, 525–526 [94 L.Ed.2d 533, 538]; accord, *Foster v. Workers' Comp. Appeals Bd.* (2008) 161 Cal.App.4th 1505, 1510 [purpose of law cannot supplant legislative intent expressed in particular statute].)" (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 48, italics omitted.)

In any event, the successor agency's description of the intent of the dissolution law conveniently ignores other aspects of the law. The successor agency claims that the Legislature's intent was to insure that the enforceable obligations of the former redevelopment agency are met, but it is also true that the intent of the dissolution law is to redirect tax increment revenues to the local agencies and school entities otherwise entitled to receive tax revenues. (Stats 2011-2012, 1st Ex. Sess., ch. 5, § 1.) Exactly how that multifaceted intent is accomplished is the province of the Legislature. And when the statutory language is plain, we enforce it as written.

2. Rights of Unsecured Third Party Creditors

The successor agency argues that the plain language of Health and Safety Code section 34183, subdivision (b) "impairs third party creditors from collecting payment for enforceable obligations." In connection with this argument, the successor agency denies that it is trying to assert the rights of those unsecured third parties; instead, it claims that we must interpret the statute so that it is consistent with the Constitution. This argument

23

is not well taken because (1) the successor agency cannot assert the rights of third parties and (2) other provisions allow loans to the trust fund to allow it to meet its obligations listed in the ROPS.

In another redevelopment case, the California Supreme Court considered a similar argument. It wrote that it would not consider the impairment of contracts issue because the successor agency had no standing to assert the impairment of contracts claims. (*Amador Valley, supra*, 22 Cal.3d at pp. 239-240.) We also decline to consider the issue without a proper party involved. In any event, we see no way to interpret the language in the way that would satisfy the successor agency without doing violence to the statutory language.

Also, the Health and Safety Code allows the trust fund to obtain other funding to meet the obligations of the former redevelopment agency. Health and Safety Code section 34183, subdivision (c) provided: "The county treasurer may loan any funds from the county treasury to the Redevelopment Property Tax Trust Fund of the successor agency for the purpose of paying an item approved on the Recognized Obligation Payment Schedule . . . ." And Health and Safety Code section 34173, subdivision (h) provides: "The city, county, or city and county that authorized the creation of a redevelopment agency may loan or grant funds to a successor agency for administrative costs [and] enforceable obligations . . . ." (Stats. 2012, ch. 26, § 7.) With these possible funding sources, the successor agency's argument that it will not be able to meet its enforceable obligations rings hollow.

3. State Controller's Interpretation of the Statute

The successor agency argues that the State Controller agrees with its interpretation of Health and Safety Code section 34183. That argument is unsupported by the record.

On June 22, 2012, the State Controller sent a letter to the County disagreeing with some of the County's analysis concerning the distribution of tax increment revenue. In the sentence most applicable to this issue, the State Controller wrote: "Specifically, we

24

do not concur that the planned county pass-through payment cannot be subordinated for the purposes of servicing the bonded debt appearing on the successor's Recognized Obligation Payment Schedule." The successor agency fails to quote this sentence and, instead, overgeneralizes, as follows: "The State Controller's analysis was consistent with the Legislature's intent to restrict auditor-controllers from withholding or deducting any amount from [Health and Safety Code section] 34183[, subdivision] (a)(2) disbursements for payment of enforceable obligations." This general statement does not take into account the State Controller's limitation of its opinion to "servicing the bonded debt." Because (1) the State Controller's letter does not appear to support the successor agency's argument that the County's passthrough payment must be subordinated to all enforceable obligations and (2) the successor agency does not quote this part of the letter and explain how it supports the successor agency's position, we cannot conclude that the State Controller agrees with the successor agency's interpretation of the effect of the reverse-waterfall provisions.

The successor agency rattles off several reasons why the County *must* comply with the State Controller's directions. Notably, no authority is proffered for any of these reasons. Therefore, the argument is forfeited, even if we were to assume for the purpose of argument that the State Controller's interpretation of the reverse-waterfall provisions is consistent with the successor agency's argument on appeal.

The successor agency argues: "The County had a mandatory duty to follow the State Controller's June 22, 2012 directions. If the County disagreed with the Controller's decision, it should have challenged it by brining a mandamus action, not by refusing to comply with the Controller's order. Unilaterally withholding money, as the County did in this case, is not part of any procedure authorized by the dissolution law. The trial court should not have countermanded the State Controller's order by allowing the County to retain funds after the Controller directed the County to make them available to [the successor agency] for payment of enforceable obligations." (Fn. omitted.)

25

This court is not obligated to act as counsel for the successor agency and search for authority to support its legal contentions.  We therefore reject these contentions as unsupported.  (See *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826-827, fn. 1 [legal contentions unsupported by authority forfeited].)

                4.        Language of Passthrough Agreement

Finally, the successor agency contends that the contractual passthrough agreement does not support our interpretation of the reverse-waterfall provision.  This contention is without merit because the passthrough agreement provided that the County would be entitled to passthrough funds provided by future legislation, such as the provisions of the dissolution law.

Even though the passthrough agreement between the County and the former redevelopment agency stated that the passthrough was to be subordinated to all of the former redevelopment agency's enforceable obligations, the agreement also provided:  "It is hereby understood by and between the parties that under no circumstances shall the amount of money paid to the County by virtue of any provisions of this Agreement be less than the statutory pass through amount presently provided in Health and Safety Code section 33607.5 [], *or any other statutory amount provided by subsequent legislative enactments*."  (Italics added.)

The dissolution law, as discussed above, with its waterfall and reverse-waterfall provisions, resulted in the County's entitlement to more passthrough funds because the passthrough is now subordinated only to the former redevelopment agency's bond debt. This change in the law redounds to the benefit of the County under the passthrough agreement's clause that the revenue distributed to the County would not be less than provided for by future legislation.  Therefore, the passthrough agreement is consistent with our conclusion that Health and Safety Code section 34183 governs the priority of tax increment distribution.

26

Because we conclude that the passthrough agreement between the County and the former redevelopment agency anticipated and incorporated future changes in the law, we need not discuss at length the Legislature's right to modify agreements made between the state's subordinate political entities. We note only that those subordinate political entities are " 'creatures' " of the state and have no standing to challenge state action on due process or impairment of contracts grounds. (*Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 6.)

### III

### *Senate Bill No. 107*

After the parties filed their briefs on appeal, the Legislature enacted Senate Bill No. 107 (2015 Reg. Sess.) (SB 107), amending the dissolution law. The County asserts that SB 107 applies to this case and requires allocation of the funds held in the impound account (pending resolution of this litigation) to the County for payment of its retirement obligations rather than to the trust fund.

SB 107 provides that revenues raised pursuant to a local pension levy cannot be paid to the trust fund unless the revenue is pledged as security for the payment of an indebtedness obligation and is needed to pay that obligation.[9] (Health & Saf. Code, § 34183, subd. (a)(1)(B); Stats. 2015, ch. 325, § 16.) Here, there is no dispute that the retirement levy was enacted to support the County's retirement program. However, two

---

[9] SB 107 provides: "Notwithstanding subdivision (b) of Section 33670, that portion of the taxes in excess of the amount identified in subdivision (a) of Section 33670, which are attributable to a property tax rate approved by the voters . . . to make payments in support of pension programs . . . and levied in addition to the property tax rate limited by subdivision (a) of Section 1 of Article XIII A of the California Constitution, shall be allocated to, and when collected shall be paid into, the fund of that taxing entity, unless the amounts in question are pledged as security for the payment of any indebtedness obligation, as defined in subdivision (e) of Section 34171, and needed for payment thereof." (Health & Saf. Code, 34183, subd. (a)(1)(B); Stats. 2015, ch. 325, § 16.)

questions arise: (1) Does SB 107 apply to tax increment collected under the retirement levy before SB 107? And (2) was tax increment from the retirement levy pledged as security for indebtedness of the former redevelopment agency, which tax increment is still needed to pay that indebtedness?

We conclude: (1) SB 107 does not apply to taxes collected under the retirement levy before SB 107 (Sept. 22, 2015), and (2) whether tax increment from the retirement levy was pledged as security for indebtedness of the former redevelopment agency and needed to pay that indebtedness is beyond the scope of appellate review.[10]

A.      *Property Taxes Collected Before Enactment of SB 107*

SB 107 took effect immediately because it provided for appropriations related to the budget bill. (Stats. 2015, ch. 325, § 31; see Cal. Const., art. IV, § 12, subd. (e)(1).) It was signed by the governor on September 22, 2015, which became its effective date. (*Ibid.*) But nothing in SB 107 made it retroactive for taxes collected before September 22, 2015. Nonetheless, the County argues SB 107 "effectively resolves the County's appeal in favor of the County and moots the City's [(successor agency's)] cross-appeal." To support this argument, the County writes: "SB 107 . . . moots issues involving money

---

**10**      In its letter brief filed after the enactment of SB 107, the successor agency argues that SB 107 does not change the definition of tax increment but instead applies only to how the money is allocated *after* it has been paid to the trust fund. The successor agency bases this argument on the fact that the relevant change made in SB 107 was to amend Health and Safety Code section 34183, which governs how funds already in the trust fund are distributed—for example, to pay the former redevelopment agency's debts, to taxing entities, and other destinations. This argument is without merit because, even though the relevant change is to the statute governing how funds are *distributed from* the trust fund, the language of the change makes it applicable to what funds are *distributed to* the trust fund. SB 107 provides: "Notwithstanding subdivision (b) of Section 33670 . . . ." That subdivision defines tax increment that must be distributed to the trust fund. Therefore, SB 107 provides that, notwithstanding the statute that defines tax increment that must be distributed to the trust fund, tax increment attributable to a tax to support a pension program is to be distributed to the taxing agency (here, the County) and not to the trust fund. (Health & Saf. Code, § 34183, subd. (a)(1)(B).)

28

impounded from past tax years, because the legislation validates the allocations of revenues made by any county auditor-controller prior to June 15, 2015. ([Health & Saf. Code,] § 34183[, subd.] (a)(1)(B).)"  (Fn. omitted.)

This argument refers to additional language included in the provision of SB 107 just discussed concerning revenues raised pursuant to a local pension levy.  The additional language provides that all "allocations" of property tax revenue before June 15, 2015, "to make payments in support of pension programs . . . are valid and shall not be affected by this section."  (Health & Saf. Code, 34183, subd. (a)(1)(B).)  The additional language also gives immunity to officials, including the county auditor-controller, for such allocations made before June 15, 2015.[11]  (*Ibid.*)

The County's attempt to use this additional language in the statute to validate its allocation of the tax increment revenue associated with the retirement levy to pay the retirement obligations of the County rather than to the trust fund to put toward the winding down of the former redevelopment agency (or to be distributed to other taxing entities) fails because the county auditor-controller did not make that allocation.  Instead, the county auditor-controller simply impounded the funds pending the outcome of this action.

When this litigation began, the county auditor-controller, in the County's words, "impounded the funds so that they would not be spent pending resolution of the dispute

---

[11]    "Notwithstanding any other law, all allocations of revenues above one cent ($0.01) derived from the imposition of a property tax rate . . . to make payments in support of pension programs . . . and levied in addition to the property tax rate limited by subdivision (a) of Section 1 of Article XIII A of the California Constitution, made by any county auditor-controller prior to June 15, 2015, are valid and shall not be affected by this section.  A city, county, city and county, county auditor-controller, successor agency, department, or affected taxing entity shall not be subject to any claim for money, damages, or reallocated revenues based on any allocation of such revenues above one cent ($0.01) prior to June 15, 2015."  (Health & Saf. Code, 34183, subd. (a)(1)(B); Stats. 2015, ch. 325, § 16.)

29

with the City." Impounding the funds so that they are not spent is different from allocating the funds "to make payments in support of pension programs." (Health & Saf. Code, 34183, subd. (a)(1)(B).)

The County claims that retaining the funds from the retirement levy tax increment and impounding them rather than paying them to the trust fund constituted allocating those funds, especially since the County did not turn the funds over to the trust fund. This stretches too thin the definition of "allocation" and is entirely inconsistent with the specific use of that word in the new statute. That statute validates "allocations of revenues . . . to make payments in support of pension programs." (Health & Saf. Code, 34183, subd. (a)(1)(B).) The funds were not allocated to that purpose; instead, they were impounded to await the decision of the courts. We conclude that (1) the retirement levy tax increment funds were not allocated by the County to make payments in support of the County's pension program, and, therefore, (2) the statute's validation provision does not apply to any funds before June 15, 2015.

Because SB 107 was not made retroactive and the validation provision of Health and Safety Code section 34183, subdivision (a)(1)(B) does not apply to the facts of this case, SB 107 does not affect the trial court's ruling with respect to pre-SB 107 taxes. Having so concluded, we continue to the question of how to apply SB 107 to taxes collected after its enactment.

B.   *Property Taxes Collected After Enactment of SB 107*

Under SB 107, revenues raised pursuant to a local pension levy cannot be paid to the trust fund "unless the amounts in question are pledged as security for the payment of any indebtedness obligation, as defined in subdivision (e) of Section 34171, and needed for payment thereof." (Health & Saf. Code, 34183, subd. (a)(1)(B); Stats. 2015, ch. 325, § 16.) Whether the retirement levy tax increment funds were pledged as security for debts of the former redevelopment agency and whether that tax increment revenue is needed to pay such debts were not issues litigated in the trial court.

30

The County contends:  "Because the County's pension levy is not needed for payment of the former [redevelopment agency's] [(RDA's)] indebtedness, the Court need not reach the issue of whether any part of the pension levy was pledged as security for the former RDA's indebtedness. . . .  [And] no part of the pension levy either was or could have been pledged as security for any of the former RDA's debts."  As support for these contentions, the County relies on evidence it wishes us to consider on appeal—namely, a declaration by the current county auditor-controller that for the past two years there have been sufficient funds to pay the debts of the former redevelopment agency without the tax increment revenue associated with the retirement levy.  The County writes:  "This state of affairs is almost certainly going to continue."

On the other hand, the successor agency wants us to take judicial notice of official letters supporting a position that the trust fund has not had sufficient funds to meet all of its obligations over the past several years.

We are not well positioned to resolve these issues, which should be resolved in the first instance, if necessary, in a trial court proceeding.  (See *In re Zeth S.* (2003) 31 Cal.4th 396, 414; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1 [evidence not presented in the trial proceeding is beyond the scope of appellate review].)  Therefore, we decline to consider what effect, if any, SB 107 has on tax increment associated with the retirement levy after September 22, 2015, the date of enactment of SB 107.[12]

---

[12]    On October 26, 2015, the County filed a request for judicial notice of (1) a bill analysis of SB 107 by the Senate Committee on Budget and Fiscal Review and (2) an undated document entitled "Five-Year Economic Forecast and Revenue Projections–2016-2020."  The request is granted as to the bill analysis and denied as to the economic forecast and revenue projections document.

The County also filed, on July 28, 2014, a request for judicial notice of (1) a letter from the City of San Jose's director of finance regarding the City's ability to pay debt

# DISPOSITION

The judgment is affirmed as to tax increment funds before September 22, 2015, and the matter is remanded for further proceedings as to tax increment funds after September 22, 2015, if necessary.  The parties must bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


                 NICHOLSON     , Acting P. J.


We concur:


     ROBIE          , J.


     MURRAY        , J.

---

service, (2) ballot pamphlet materials for Proposition 87 (Gen. Elec., Nov. 8, 1988), (3) excerpts from Assembly Bill No. 26 X1, and (4) the Assembly Floor Analysis for Assembly Bill No. 26 X1.  The request is denied as to the first document and granted as to the remaining documents.

On November 25, 2015, the successor agency filed a request for judicial notice of five letters from the county auditor-controller to the State Controller concerning the sufficiency of funds to meet the trust fund's obligations.  The request is denied.